2020 IL App (2d) 180311-U
No. 2-18-0311
Order filed September 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-632 |
| | ) | |
| BRIAN ODELL, | ) | Honorable |
| | ) | Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial counsel was not ineffective for failing to: (1) move to redact defendant's cell phone records; or (2) preserve a hearsay objection by including it in a motion for new trial. Affirmed.

¶ 2    After a jury trial, defendant, Brian Odell, was convicted of two counts of armed violence (720 ILCS 5/33A-2 (West 2016)) and two counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)).  The trial court denied his motion for a new trial and sentenced defendant to concurrent terms of 18 years for the armed-violence convictions and 10 years for the armed-robbery

convictions. On appeal, defendant challenges only the effectiveness of his trial counsel on two bases. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The events at issue took place in Woodstock on June 27, and 28, 2017. Specifically, around 1 a.m. on June 28, 2017, Jerrell Walker, Stacey Johnson, Maurice Timberlake, and Deanna Miraldi, went to Candice Craig's house. Craig was present there with her friend, David Horn, as well as with defendant and his acquaintance Tony (last name unclear). A fight broke out. The State's theory of the case, in sum, was that, in a "classic shakedown," defendant and Tony were armed with guns, attacked Walker and his friends, stole Walker's wallet and Miraldi's cell phone, and fled. Defendant, in contrast, testified that the fight occurred when Walker and the friends, loudly and rudely, walked into Craig's house without knocking. Words were exchanged and, when Timberlake reached for his waist "like he was about to brandish a weapon," defendant grabbed his wrist and the altercation turned physical.

¶ 5      It was undisputed that Craig, who has multiple sclerosis, knew defendant, in part, because he gave her marijuana to help with her depression and to ease her physical pain. At trial, the State suggested that defendant also sold Craig harder narcotics, which both she and defendant denied. Timberlake, however, testified that, around 7 p.m. on June 27, 2017, Craig asked him to find her some crack cocaine. Timberlake called Walker, and Walker came over and sold Craig $50 worth of crack cocaine. Craig wanted more, but she claimed that someone had stolen the rest of her money. Timberlake denied doing so, but Craig had a "wild look in her eye," so Timberlake and Walker left. Later, however, around 11:30 p.m., Craig called Timberlake and said she wanted to buy more crack cocaine. Ultimately, Timberlake, Walker, Johnson, and Miraldi, who had all been hanging out together, went to Craig's house. According to Timberlake, they arrived around 1 a.m.,

and Horn let them in. As they walked into the kitchen, which was dark, two people approached them with weapons and the attack commenced. Timberlake passed out from his wounds and was taken to the hospital, where he received stitches and treatment for a fractured hand. Miraldi testified that she was hit in the back of the head, a gun was put to her head, someone said that he would "blow her head off," and her cell phone was stolen. The men attacking them said, "where is the money? You got no money? What's wrong—these people got no money, they got no money."

¶ 6    Craig testified that, in the afternoon on June 27, 2017, she did not buy crack cocaine from Timberlake, but tried to buy marijuana. When Timberlake was at her house, she left her wallet in the kitchen with $300 in it, but, when she returned to the kitchen, the wallet was empty. Craig agreed that, after he left, she called Timberlake several times later that night, and she explained that she wanted him to come over to discuss if he had taken her money. She did not know that he would come over with several people. According to Craig, defendant and his friend arrived at her house around 10 p.m., mostly to say "hi," not necessarily to bring her drugs. Because she was upset, Craig told defendant that Timberlake took her money. According to Craig, when Timberlake walked into her house without knocking and with other people, defendant asked why he barged in without knocking and, as the exchange became heated, she shut herself into her bedroom due to her "PTSD" and did not witness the physical altercation. Horn later testified that he sat on the couch during the altercation and continued watching a movie. Police testified that Craig and Horn were calm and composed after the incident.

¶ 7    Walker ran outside of the house and called 911; he saw defendant and Tony leave the house and get into a dark-colored Cadillac. Officers observed a dark-colored Cadillac near the scene and pursued it with emergency lights activated. The Cadillac did not pull over, the pursuit reached

speeds in excess of 100 miles per hour, and, given the high speeds and inherent danger, officers terminated the chase. Upon retracing the route, officers located a white t-shirt that had blood and Walker's DNA on it. Walker's wallet was found in the back of a pickup truck in Genoa, along the Cadillac's route.

¶ 8    Defendant's wife, Sarah, testified that their marriage had been "up and down" and that defendant did not always stay at home overnight. She did not know where he stayed, and she had accused him of having a relationship with a woman named "Liz." Sarah had seen the Cadillac before, but did not know who "drove" it.

¶ 9    On June 29, 2017, defendant was arrested at his home. A cell phone was found on his person, and a black Cadillac was parked outside. Prior to the arrest, officers watched defendant go inside his neighbor's, Daniel Hyc's, house. They learned that Hyc had an outstanding warrant, so they entered his house and detained him. Hyc consented to a search of his residence, and police collected therein a cell phone, which Miraldi later identified was hers, an empty gun case, and a gym bag that contained items belonging to defendant's wife.

¶ 10    On cross-examination, officer Daniel Cortese of the Hanover Park police department confirmed that the only connection between the gun case and the instant offense was that the gun case was found in Hyc's garage (which defendant had entered.) On redirect, Cortese testified that other weapons in Hyc's house were not collected, because Hyc indicated that they belonged to him. The State then asked, "And isn't it true that ***," at which time, defense counsel objected. The court overruled the objection. The State continued, " *** Daniel Hyc told you that that was defendant's gun case?" Defense counsel objected on hearsay grounds, and the court again overruled the objection. Cortese then answered, "Correct."

¶ 11    The cell phone found on defendant's person was taken to the police department, and a program called Cellebrite was used to download and copy the data off of the phone.  The program created a report more than 2,000 pages long, which listed text messages, pictures, contacts, emails, and the call history extracted from the phone.  At trial, detective Shane Marshall identified a 149-page excerpt from the Cellebrite report.  Defense counsel objected to the report on the bases of foundation, chain of custody, and regarding warrant concerns.  Outside the jury's presence, the State informed the court that defense counsel had stipulated to the report.  Counsel responded, "I stipulated to the Cellebrite manner of extraction, but not that it's relevant or it comes into evidence.  I didn't say it comes into evidence."  After a few questions, counsel elaborated, " *** I agreed in the stipulation that I don't need the Cellebrite operator to come in or anybody from AT&T.  I said that's fine.  But the information they extract still has to be proper both in foundation and relevance and it's not."  Further, counsel explained that, while foundation for the Cellebrite process for extracting information was sufficient, foundation was improper for the information on the phone itself.  The court overruled defendant's objections.

¶ 12    Marshall also identified a chart of text messages and calls between defendant's phone and Craig's phone, which showed that, at 6:39 p.m., Craig texted defendant a message that said, "U have."  The following calls were made between Craig and defendant on June 27, and June 28, 2017: from Craig to defendant at 11:50 p.m., from defendant to Craig at 1:30 a.m, from defendant to Craig at 1:44 a.m., from Craig to defendant at 3:29 a.m., and from defendant to Craig at 7:05 a.m.  Further, defendant called a contact named "Thunder Dan," whom he confirmed was Dan Hyc, 16 times on June 28, 2017, beginning at 2:59 a.m., with one call lasting 20 minutes.

¶ 13    Finally, Marshall identified three pictures found on the phone taken from defendant.  One photo reflected a screenshot of a map of Genoa, taken on June 28, 2017, at 3:48 a.m.  In addition,

there were two photos of a firearm that were taken on June 27, 2017, at 2:35 p.m. and 3:36 p.m. The serial number of the firearm in the picture matched the serial number on the gun case that was found in Hyc's house.

¶ 14    After his arrest, defendant denied that he was in Woodstock the night of the incident and stated that officers would not be able to prove that he was there. In his trial testimony, however, defendant explained that he made that comment only because he was mad that officers had handcuffed his entire family, including his children, when they came to arrest him. Defendant testified that he went to Craig's apartment and brought her a small amount of marijuana to help with her pain; he did not charge her for it, but he gave it to her so that she would not try to obtain harder narcotics. Defendant elaborated that he was generally sympathetic to persons with disabilities or ailments, in part because he has an autistic child. Defendant explained that the black Cadillac belonged to his friend's girlfriend, and, on the night in question, he let Tony drive it because he had a driver's license, while defendant did not.

¶ 15    Defendant presented his explanation of events within the house, as summarized above. After the fight, and when Walker ran out of Craig's home, defendant explained that Tony wanted to leave. They got into the Cadillac, with Tony driving, and, although defendant told Tony to pull over for police, Tony claimed that he had outstanding warrants in Cook County and could not go to jail.

¶ 16    Defendant testified that he did not have a gun that night and that he does not own a gun. Defendant explained that the gun in the photos belonged to Hyc, and defendant took pictures of it, because it had design elements that defendant thought were "pretty cool."

¶ 17    On cross-examination, defendant acknowledged that Craig was listed in his contacts as "Cindy Geek." In his phone, 17 other contacts also had the last name "Geek." He used the term,

because his wife was jealous and, that way, she would not think that anyone was better than her. Defendant testified that he never sold Craig crack cocaine, because he did not sell drugs. According to defendant, when Craig texted him the message, "U have," she was not trying to buy drugs, but was asking if he was "coming through." The State then asked defendant about two other series of text messages on his phone. First, from a contact named "Mark" on May 23, 2017, which stated "Hey B, I got 40. Can we hook up somewhere?" Defendant responded, "Yeah, but all I have left is a 30. You want that?" Second, with a contact named "Don" on June 29, 2017, which stated, "Would you be willing to come here for a good 50 of hard and I'll give you $60?" Defendant responded, "You at home?" Don replied, "if you think you be here quick, I'll get a hundred. And yes at home," and, further, "Could I leave the cash in the Kia? I don't want to risk my son seeing anything." Defendant texted back, "Okay. I got you. I'll bring a hundred and, yes, you can put it in Kia. Do you want me to leave your stuff in the Kia also?"

¶ 18   Defendant denied that Craig told him that Timberlake stole $300 from her. Defendant denied being on the phone with Hyc during the car chase and claimed that, if there was a call, it was a "butt dial." Defendant stated that the Cadillac overheated after the chase, so he called Hyc to pick him up, and he sent Hyc a screenshot of where he was located.

¶ 19   We note that, in his testimony, defendant acknowledged his criminal record, which included convictions for second-degree murder, possession of a controlled substance, and "several other felonies," including cannabis charges. Defendant was, at one point, sentenced to 14 years' imprisonment, but was released early for good behavior. At the time of trial, defendant and his wife owned a landscaping company.

¶ 20   The jury instructions included those pertaining to accountability. The jury ultimately found defendant guilty of armed violence, armed robbery, mob action, and unlawful restraint. However,

the jury found defendant *not guilty* of armed habitual criminal and unlawful possession of a firearm by a felon. In addition, it found that the State did not prove the special interrogatory, *i.e.*, that defendant possessed a firearm during the armed robbery.

¶ 21 The court denied defendant's motion for a new trial, and it sentenced defendant to 18 years' imprisonment for armed violence and 10 years' imprisonment for armed robbery. Defendant appeals.

¶ 22                                   II. ANALYSIS

¶ 23 On appeal, defendant contends that the central issue at trial was whether the jury believed testimony from the complainants, *i.e.*, that defendant robbed them at gunpoint, or his testimony that a verbal altercation turned into a physical fight. Defendant argues that the jury made this credibility determination while, due to his counsel's ineffectiveness, considering two improper pieces of evidence. First, defendant asserts that counsel was ineffective, where he did not object to the jury receiving an unredacted, 149-page excerpt of the data report extracted from defendant's phone that contained evidence of other bad acts. Second, defendant asserts that counsel was ineffective, where he did not preserve a meritorious hearsay objection. Defendant argues that, cumulatively, the introduction of these pieces of evidence prejudiced him, because it lent credence to the State's assertion that defendant possessed a firearm during the relevant events and made the jury more likely to convict him on the basis that he was a bad person deserving punishment. He contends that the jury was deluged with evidence of bad acts suggesting that he was a bad person, which was amplified by the fact that much of it was vague, allowing the jury to speculate. Further, where the jury never received a limiting instruction, it presumably followed the court's instruction to weigh witness credibility in light of all the evidence and did so while considering improper evidence. Defendant asks that we reverse his conviction and remand for a new trial.

¶ 24    To establish a claim of ineffective assistance of counsel, a criminal defendant must establish deficient performance and prejudice, namely: that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  See *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *People v. Bull*, 185 Ill. 2d 179, 203 (1998).  If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, we need not determine whether counsel's performance was deficient.  *Id*.  Where the ineffective-assistance claims were not litigated below, we review them *de novo*.  *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 25                                    A. Phone Records

¶ 26    Defendant concedes that some of the information in the report summarizing his phone data was related to the time of the offense.  However, he argues, the vast majority of the report was irrelevant and served only to portray him in an unfavorable light, including extensive references to drug dealing, other arrests, purposeful absence from court appearances, marital problems, and apparently-pornographic emails.  For example, he notes that the State mentioned at trial two text exchanges, during his cross-examination and in closing argument, to imply that he was a drug dealer.  Although defendant acknowledges that the two text exchanges ostensibly impeached defendant's testimony that he did not sell drugs, defendant contends that they still should have been excluded, as whether or not he was a drug dealer had very limited probative value in this case and, instead, concerned a minor, collateral point.  He notes that, in its opening statement, the State argued that this case was not about drug dealing but, rather, was a "classic shakedown" motivated by events earlier that day.  In addition to the two text messages read during trial, the report

contained numerous other text messages that, while not always explicit, contained the implication of drug dealing, leaving the jury to speculate as to what, exactly, defendant had done in his past. In addition, defendant asserts that the exhibit contained text exchanges he had with his attorney in another case, where defendant stated that he would not appear in court or turn himself in on a warrant, as well as messages with his wife, wherein she accused him of infidelity. Defendant contends that all these communications were privileged (attorney-client and spousal privileges) and were prejudicial. Finally, defendant notes that some of the emails in the report contained purportedly-pornographic subject lines. Such emails were irrelevant, had no connection to this case, and served merely to cast defendant as a bad person. In sum, defendant contends that his counsel should have asked to redact 74 text messages alluding to drug dealing, 15 text messages between defendant and his attorney, 60 text messages about his marital problems, and 17 potentially-pornographic emails. Defendant argues that there could be no sound strategic reason for defense counsel to refrain from objecting to the vast majority of the report as inadmissible and overly prejudicial, or from moving that the report be redacted, as he previously objected to admission of the report in its entirety on foundational grounds. Defendant notes that "[w]hen evidence of unrelated offenses is contained in an otherwise competent statement, it must be deleted before the statement is provided to the jury, unless to do so would seriously impair its evidentiary value." *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 26. For the following reasons, we reject defendant's ineffective-assistance claim.

¶ 27     Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, even relevant evidence is inadmissible if "its probative value is substantially outweighed by the danger of unfair prejudice."

Ill. R. Evid. 403 (eff. Jan. 1, 2011). Evidence of other crimes creates a risk that jurors may convict a defendant based upon a belief that he or she is a bad person deserving of punishment, as opposed to based upon a fair weighing of the evidence. See, *e.g.*, *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998). Other-crimes evidence is not limited solely to prior convictions; it may include other bad acts, even if not illegal. See, *e.g.*, *Gregory*, 2016 IL App (2d) 140294, ¶ 23.

¶ 28    As noted, defendant concedes that some of the report was relevant concerning text messages and calls around the time of the event, and, at trial, the State mentioned only two text exchanges from the entire 149-page report (which, we note, was formatted in a chart/spreadsheet format with 4133 entries). And while it is true the report contained more references to possible drug dealing, attorney communications, and marital infidelity than introduced at trial, it is exactly *because* they were not the focus of the trial and the jury was generally already *aware* of these issues that we conclude that, even if it was objectively unreasonable for trial counsel to not move for the document to be redacted, there is not sufficient prejudice to undermine our confidence in the outcome. See, *e.g.*, *People v. Coleman*, 168 Ill. 2d 509, 528 (1995) (prejudice prong requires a showing that counsel's error was so serious that the defendant was denied a fair trial, leading to a trial with an unreliable result). Assuming for purposes of this analysis that counsel should have objected and/or redacted the document *and* that the jury reviewed all entries in the voluminous report, considering the evidence as a whole, we simply cannot say that the error led to an unreliable trial result.

¶ 29    Craig testified that defendant sold her marijuana; defendant testified that he gave Craig marijuana. Defendant testified that he had previously been convicted of drug-related charges, including those concerning marijuana and possession of controlled substances. Defendant's connection to illegal drugs, whether he possessed them and distributed them freely or whether he

sold them, was a relevant contextual point presented to the jury, even absent the report. Further, and we think relevant to defendant's position that texts implying drug dealing weighed against him in this credibility contest, we note that the State's witnesses were *also* involved in drug dealing. Indeed, Craig testified that she bought marijuana from Timberlake, while Timberlake testified that Craig asked him to help her obtain crack cocaine, that Walker sold her crack cocaine on June 27, 2017, and that they returned to Craig's house in the early morning hours of June 28, 2017, because she had reached out seeking more drugs. Thus, the issue of drug dealing was inherent in the trial, because it provided context to the relevant events and how they developed, but, as defendant notes, the State correctly informed the jury that the case was not about the drug dealing. As such, to the extent that the jury saw additional text message implying that defendant sold drugs, we think that the proverbial "cat was out of the bag" on that issue, and we do not agree that it prejudiced defendant to a degree that undermines confidence in the outcome.

¶ 30    Similarly, defendant's wife testified that their marriage had been "up and down," that he often did not stay at home overnight, and that she had accused him of infidelity. Defendant explained that his wife was jealous, and that he named contacts in a manner to avoid her thinking that he found anyone better than her. Again, the concept that defendant might have engaged in marital infidelity was already before the jury, even absent the report.

¶ 31    As to the messages with his attorney concerning court appearances and emails with sexually-explicit subject lines, we again do not think that any resultant prejudice deprived defendant of a fair trial. The privileged text exchanges, again, assuming that the jury read them, were not voluminous and did not concern this case. The sexually-explicit subject lines on emails were not suggestive of more than the type of "spam" emails that many users receive due to phishing

and other such online activities and, thus, we do not think that the jury would have reason to believe that they were personal to defendant or his lifestyle.

¶ 32    In sum, assuming for purposes of this analysis that counsel erred in failing to move that the report be redacted before it went back with the jury, viewing the record as a whole, we do not agree that counsel's error here was so egregious that it undermines our confidence in the trial outcome.

¶ 33                                    B. Hearsay Testimony

¶ 34    Defendant next argues that counsel failed to preserve a meritorious hearsay objection for our review.  Specifically, when the State asked officer Cortese whether Hyc told him that the gun case found in Hyc's house belonged to defendant, Cortese answered, "correct."  Although defense counsel's contemporaneous hearsay objection was overruled, counsel did not include the issue in the motion for a new trial and, thus, did not preserve the issue.  This was ineffective, defendant contends, because the issue would have been meritorious.  Defendant contends that the testimony that Hyc told Cortese that the gun case belonged to defendant was offered for the truth of the matter asserted, and was, therefore, hearsay, yet no applicable hearsay exception was offered to allow admission of such testimony.  Further, he argues, even if the testimony was not hearsay, it held little relevance if not offered for the truth and, therefore, was unduly prejudicial.  Defendant notes that the jury was not instructed to consider the evidence for a limited purpose, as opposed to for the truth of the matter asserted.  Finally, defendant argues that, as there was no evidence that Hyc was unavailable and he did not testify at trial, the testimony violated defendant's due-process rights to confront the evidence against him.

¶ 35    To properly preserve an error for appellate review, trial counsel must contemporaneously object and include the issue in a posttrial motion.  *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988).

Here, however, assuming that counsel's failure to argue the hearsay issue in the posttrial motion was objectively unreasonable, we again conclude that there was insufficient prejudice to undermine confidence in the outcome. The main prejudice that might have arisen from this alleged hearsay was testimony connecting defendant to a gun. However, although each of the State's complaining witnesses testified that there was at least one firearm present during the fight, the jury *acquitted* defendant of the charges of armed habitual criminal and unlawful possession of a firearm by a felon. In addition, it found that the State did not prove the special interrogatory, *i.e.*, that defendant possessed a firearm during the armed robbery. Thus, although the jury concluded that a weapon was present during the crimes, it found that the State did not meet its burden of proving that *defendant* was the person who possessed it. As such, despite counsel's alleged error, there was minimal, if any, prejudice to defendant from the introduction of hearsay possibly connecting him to a gun.

¶ 36                                C. Cumulative Error

¶ 37    Defendant has framed his ineffective-assistance claims to argue that the *cumulative* effect of the two alleged errors deprived him of a fair trial. Generally:

> " '[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error.' [Citation.] 'However, the cumulative errors that warrant such an extreme result must themselves be extreme.' [Citation.] 'There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue.' " [Citation.] *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55 (2019).

¶ 38    Here, neither of defendant's appellate arguments amounts to reversible error.  The record does not reflect any unfair prejudice to defendant's case.  As such, they do not, cumulatively, require a new trial.

¶ 39                      III. CONCLUSION

¶ 40    For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 41    Affirmed.